REDACTED COMPLAINT PURSUANT TO
RCFC 5.2 AND 9(m)
AND
MOTION FOR PROTECTIVE ORDER FILED MAY 8, 2025

## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Conversant, Inc. & Subsidiaries,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**The United States of America,**<br><br>**Defendant.** | **No.** ___25-793 T_____ |

## COMPLAINT

Plaintiff, Conversant, Inc. & Subsidiaries ("***Conversant***" or "***Plaintiff***"), brings this action against Defendant, the United States of America, seeking a tax refund for Conversant's tax year that ended on December 31, 2013.

In support of its claim, Plaintiff alleges as follows:

## NATURE OF THE DISPUTE

1.      This tax refund case arises from a dispute about whether the substance of the transactions that Conversant entered into with its customers (*i.e.,* advertising agencies and consumer brands) in its taxable year 2013 was, in whole or in part: (a) a lease or other disposition of software to its customers under Treas. Reg. § 1.199- 3(i)(6)(i); or (b) the provision of software to customers that qualifies under the third-party comparable exception of Treas. Reg. § 1.199-

3(i)(6)(iii).[1]

2.      Conversant maintains that, if it meets either qualification standard, then it is deemed to provide its software to its customers for their direct use allowing the customer to direct and choose specific elements of the software functionality enabling the customer to provide an advertising service to themselves.  Under this understanding of the facts, a reasonably determined allocated portion of the receipts derived from Conversant's customers during the 2013 taxable year qualify as domestic production gross receipts ("**DPGR**") under section 199(c)(4) of the Code, which gives rise to a domestic production activities deduction ("**DPAD**") under section 199(a) of the Code.

3.      The Internal Revenue Service ("**IRS**") advances *inter alia* the following primary positions in this case:

    a.    The IRS argues that Conversant during the taxable year at issue did not lease or otherwise dispose of its software to customers as required under Treas. Reg. § 1.199- 3(i)(6)(i);

    b.    The IRS argues that, under the "threshold" requirement of Treas. Reg. § 1.199- 3(i)(6)(iii), the customers of Conversant did not directly use the software that is part of  the product sold to Conversant's customers, and that the Conversant software was used by Conversant (and not by the customer) to provide an advertising service to its customers;

    c.    The IRS argues that, even if the threshold requirement was met, Conversant failed to demonstrate the existence of third-party comparable software meeting the

---

[1]   Unless noted otherwise, all "section" references are to chapter 26 of the United States Code in effect during the 2013 year at issue, and all "Treas. Reg." references are to Title 26 of the Code of Federal Regulations in effect during such year at issue.

requirements of Treas. Reg. § 1.199- 3(i)(6)(iii)(B);

d.   The IRS argues that if Conversant otherwise meets the qualification requirements

of Treas. Reg. § 1.199- 3(i)(6)(i) or Treas. Reg. § 1.199- 3(i)(6)(iii), that it has

not reasonably allocated its customer receipts between DPGR and non-domestic

production gross receipts ("***non-DPGR***"); and, finally,

e.   The IRS argues that if Conversant otherwise overcomes the above-listed four

primary positions of the IRS, then the DPAD is limited by the 50% wage limitation

set forth in section 199(b)(1).  Conversant does not dispute the 50% W-2 wage

limitation.  However, the IRS takes issue with Conversant's computation and

determination of the appropriate W-2 wages included in the 50% limitation.

4.      The IRS is wrong on all of its above-argued five positions, and Conversant is

entitled to the DPAD claimed for its 2013 tax year.

5.      The question of whether Conversant is entitled to the DPAD in its 2013 tax year

(and, if so, how much) has other tax implications.  If this Court holds that the IRS position is

erroneous, then this conclusion may result in other adjustments that follow by operation of law

from the allowance of Conversant's claim.  These correlative adjustments may need to be

addressed by the Court to the extent that the IRS position with respect to the claimed DPAD is

erroneous.

## IDENTITY OF THE PARTIES

6.      Conversant, during the taxable year at issue, was an independent company

offering its customers (*i.e.,* advertising agencies and consumer brands) a set of technology-based

software products and services to help these brands reach their marketing and advertising goals

and improve their sales performance.[2]  The IRS Examination Division ("***Exam***"), in its Form

5701 - Notice of Proposed Adjustment - issued in this case on March 22, 2021, together with

Form 886-A  attached thereto (hereinafter together referred to as the "***Examination Report***"),

adopts without modification or dispute certain portions of the description of Conversant's

business found in **Exhibit 1** attached hereto (highlighted), which is a copy of Section 3.3.2 of

the Examination Report (pages 6 and 7 of the Examination Report) that contains the language

quoted in the paragraphs below.    The Examination Report states that (emphasis supplied):

 

    a.   Conversant has "industry expertise and **proprietary technology platforms** [*i.e.,*

       software platforms] for online advertisement inventory aggregation, campaign

       targeting, delivery and measurement, and payment settlement and delivery

       services for its publisher partners." *Examination Report,* pages 6 and 7.

    b.   "[Conversant] provides **technology infrastructure tools** and services that enable

       advertisers and advertising agencies to create their own online advertisement

       displays and email campaigns, and that assist web publishers with management

       of website inventory.  Additionally, [Conversant] provides **technology** that

       assists advertising agencies and other companies with information management

       regarding their financial, workflow and offline media planning and buying

       processes." *id.*

---

[2] Conversant filed its original federal income tax return and other IRS filings for the 2013 tax year under the name ValueClick, Inc. & Subsidiaries ("***ValueClick***").  ValueClick changed its corporate name on February 3, 2014 to Conversant, Inc. & Subsidiaries.  For ease of reference in this Complaint, ValueClick will be referred to as Conversant unless the context requires otherwise, primarily since the Form 1120X for 2013 was filed in the name of Conversant and the IRS Formal Notice of Disallowance was addressed to Conversant.

      c.    Conversant "offers **software** that handles the targeting and delivery of website

          display ads and manages emails for customers with online consumer

          relationships." *Id.*

    7.    What is evident from the above presented Examination Report's description of

Conversant's business is that the business was centered on "proprietary technology platforms" (*i.e.,*

software), "technology infrastructure tools" (*i.e.,* software), and "software."  What Conversant's

software did in 2013, and continued to do in succeeding years, was to provide advertising agencies

and consumer brands with a web-based portal to use the tools and functionality of software housed in

Conversant's servers to create their own unique and individually-configured advertising campaigns.

    8.    Two of Conversant's subsidiaries, Commission Junction, Inc. ("**CJ**") and MediaPlex,

Inc. ("**MP**"), produced the software in the United States and marketed the ad serving software

platforms that are the centerpiece of this dispute.  CJ offered its customers the CJ Affiliate Platform

(hereinafter referred to as the "***CJ ad server platform***") and MP offered the MOJO Technology

Products and Services Platform (hereinafter referred to as the "***MP ad server platform***").   In

general, both subsidiaries offered their software platforms to advertising agencies and consumer

brands (*i.e.,* the customers of CJ and MP).  Access to these ad server software platforms was provided

through a user-friendly web-based interface (*i.e.*, a software key that opened the full CJ and MP ad

server software platforms to the customer), enabling each customer *inter alia*: (a) to use and

specifically direct and program individual functional aspects of the software; (b) to serve the

advertisements prepared by the customer on different websites; (c) to direct these advertisements to

specific demographic audiences; (d) to present the specific advertising creatives at specific times

and for a specified number of impressions a day; (e) to extend or to terminate early a specific

advertising campaign; and (f) to generate reports specific to the customer tracking performance of

its advertising campaigns.  CJ's and MP's ad server products also offered a full set of advanced

tools for analytics, optimization, targeting, conversion tracking, rich media and dynamic messaging.

9.    On December 10, 2014, Conversant was acquired by Alliance Data Systems Corporation ("**ADS**"), and Conversant became part of the Epsilon business unit of ADS. Epsilon was sold to Publicis Groupe (a U.K. public company) ("**Publicis**") on July 1, 2019. Under the terms of the ADS/Publicis Stock purchase agreement, ADS retained all rights and obligations relating to issues arising out of the Conversant 2013 tax year, including the right to manage, litigate, and settle any such 2013 tax issues.  (*See* **Exhibit 2** (highlighted) attached hereto which addresses the rights of ADS to the refund sought herein and its right to control the 2013 refund litigation.)  ADS changed its corporate name to Bread Financial Holdings, Inc. ("**Bread Financial**") on March 23, 2022.

10.    During the 2013 tax year, the Conversant headquarters was located at 30699 Russell Ranch Road, Westlake Village, Suite 250, California 91362.  The Conversant employer identification number is, and was during the 2013 tax year, ████5335.  The headquarters of Bread Financial is currently located at 3095 Loyalty Circle, Columbus, OH 43219, and its employer identification number is ████9215.

11.    Defendant is the United States of America.

## JURISDICTION

12.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491.

13.    Plaintiff fully paid the taxes in issue in this case on or before the original due date (without extension) for the filing of its 2013 tax return. Conversant's federal income tax payments for its 2013 taxable year are listed on the copy of Conversant's IRS Transcript attached as **Exhibit**

**3**.

14.    Plaintiff filed the refund claim at issue in this case (*see* **Exhibit 4** attached) within the period specified in 26 U.S.C. § 6511.

15.    Plaintiff filed this Complaint within the period specified in 28 U.S.C. §§ 2401, 2501, and 26 U.S.C. § 6532.

## STATEMENT OF CLAIM

16.    In its claim for refund (**Exhibit 4**), Conversant contends that, for its 2013 taxable year, it was entitled to DPAD of $7,971,939, which deduction results in a tax refund of $2,790,178.

17.    Conversant contends that the IRS incorrectly failed to grant any portion of Conversant's refund claim related to its 2013 tax year by erroneously determining the applicable facts of the case and applying an incorrect interpretation of the section 199 statute and regulations.  Conversant claims herein that it is entitled to a refund of $2,790,178 (or such greater amount as this Court may determine).

## LEGAL BACKGROUND[3]

18.    Section 199 was added to the Code as part of the American Jobs Creation Act of 2004 in order to provide an incentive to taxpayers to undertake domestic manufacturing and production activities by allowing qualifying taxpayers to claim a deduction equal to a fraction of their taxable income derived from domestic production activities.[4]   Specifically, for the taxable year at issue, section 199 allowed a DPAD equal to 9% of the Taxpayer's qualified production activities income

---

[3]  For simplicity, this legal background section addresses the overall aspects of law most relevant to the facts of this case.

[4]  Sec. 13305(a) of Pub. L. 115-97 (Tax Cut and Jobs Act) repealed Section 199, effective for taxable years beginning after December 31, 2017.

("**QPAI**"), subject to a limitation that QPAI could not exceed a taxpayer's taxable income (section 199(a)(2)) and a second limitation that QPAI could not exceed 50% of the Taxpayer's W-2 wages related to the domestic production activities (section 199(b)(1)). QPAI, in turn, is defined as DPGR minus expenses properly allocated and apportioned thereto (section 199(c)). The term DPGR, in turn, is defined as the gross receipts of the taxpayer that are derived from "any lease, rental, license, sale, exchange, or other disposition of . . . qualified production property which was manufactured, produced, grown or extracted [("**MPGE**")] by the taxpayer in whole or in significant part within the United States." ( Section 199(c)(4)(A).) For purposes of section 199, qualified production property expressly includes "any computer software." *See* section 199(c)(5)(B).

19. Computer software is broadly defined in Treas. Reg. § 1.199- 3(j)(3) as "any program or routine or any sequence of machine-readable code that is designed to cause a computer to perform a desired function or set of functions, and the documentation required to describe and maintain that program or routine. . . . Computer programs of all classes, for example, operating systems, executive systems, monitors, compilers and translators, assembly routines, and utility programs, as well as application programs, are included." The software embodied in the CJ and MP ad server products falls squarely in the Treas. Reg. § 1.199- 3(j)(3) definition.

20. Treas. Reg. § 1.199-3(i)(6)(i) specifically states that DPGR includes the gross receipts of the taxpayer that are derived from the lease, rental, license, sale, exchange, or other disposition of computer software MPGE by the taxpayer in whole or in significant part within the United States. Thus, if Conversant can demonstrate that it leases, licenses or otherwise disposes of its software to customers in connection with its ad server software technology platforms, then the revenue derived from such lease, license, or other disposition of its software is DPGR, and Conversant is entitled to the resulting DPAD. The regulation defaults to the general tax law determination as to what constitutes a lease or a license, but there is no specific regulatory guidance

as to when a taxpayer may be deemed to "otherwise dispose" of software.

21.    Whether a particular transaction is a lease for section 199 purposes is determined under applicable Federal income tax principles.  *See* Treas. Reg. § 1.199-3(i)(1)(i); *see also* Rev. Rul. 2011-24, I.R.B. 2011-41 (Sept. 16, 2011).  The facts in this case demonstrate that the CJ and MP customers obtain full use and control over the software included within the CJ and MP ad server software platforms and they use this software to perform a service for themselves.

22.    Section 7701(e)(1) provides, in pertinent part, that a contract which purports to be a service contract shall be treated as a lease of property if such contract is properly treated as a lease of property, taking into account all relevant factors, including whether or not: (a) the service recipient is in ***physical possession*** of the property; (b) the service recipient ***controls*** the property; (c) the service recipient has a ***significant economic or possessory interest*** in the property; (d) the service provider does not bear ***any risk of substantially diminished receipts or substantially increased expenditures if there is nonperformance*** under the contract; (e) the service provider does not ***use the property concurrently*** to provide significant services to entities unrelated to the service recipient; and (f) the total contract price does not ***substantially exceed the rental value*** of the property for the contract period.  (Emphasis supplied.)

23.    Thus, section 7701(e) expressly requires an analysis of the underlying substance of a purported "services contract" to determine whether, in fact, it constitutes a lease of property.   No single Section 7701(e) factor is controlling, and the importance of any factor in the analysis depends on the facts and circumstances. *See Tidewater v. Commissioner*, 565 F.3d 299 (5th Cir. 2007).  Under the preponderance of the above-listed factors, the customers acquire the CJ and MP ad server platforms pursuant to a lease of the underlying software.

24.    Further, as the Supreme Court explained in *Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369 (2024) ("*Loper*"), "the role of the reviewing court under the APA is, as always, to

independently interpret the statute and effectuate the will of Congress subject to constitutional limits."   603 U.S. at 395.  The *Loper* Court went on to state that, "when faced with a statutory ambiguity in such a case, the ambiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute.  Courts in that situation do not throw up their hands because 'Congress's instructions have' supposedly 'run out,' leaving a statutory 'gap'. *Post*, at 449 (opinion of Kagan, J.).  Courts instead understand that such statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning.  That is the whole point of having written statutes; 'every statute's meaning is fixed at the time of enactment.'" *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 284, 138 S. Ct. 2067, 201 L. Ed. 2d 490 (2018). Deciding whether the CJ and MP ad server platforms should be construed, for tax purposes, to be "leased to" or "otherwise disposed of" to a customer under the terms of Section 7701(e) and Treas. Reg. § 1.199-3(i)(1)(i) requires this Court to consider the Congressional mandate that section 199 was provided to encourage the production of software products in the United States.  The decision as to whether the applicable statutes and regulations enable Conversant to claim DPAD on the receipts derived by CJ and MP from their customers is not delegated to the IRS, but remains, under *Loper*, within the parlance of this Court to determine the "single, best meaning" of the applicable statutory provisions and related regulations.

25.    Even if Conversant cannot demonstrate that it directly leases, licenses or otherwise disposes of its software to customers in connection with its ad server software technology platforms, Conversant may nevertheless qualify its software for the DPAD under the provisions of Treas. Reg. § 1.199- 3(i)(6)(iii).  Congress made this point clear when the then-sitting Chairmen of the House Ways and Committee and the Senate Finance Committee wrote a letter to the IRS and

the Treasury ("**Congressional Letter**") regarding the pending guidance project on Section 199.[5] Specifically, the Congressional Letter asked IRS and Treasury "to consider further the treatment of online access to computer software and, in particular, whether such treatment should be similar to that of software distributed by other means, such as by physical delivery or delivery via internet download."

26.    Responding to this Congressional Letter, Treasury promulgated Treas. Reg. § 1.199-3(i)(6)(iii), wherein DPGR treatment extends to "gross receipts derived from providing customers access to computer software . . . for the customer's direct use while connected to the Internet or any other public or private communications network (online software) . . ." if certain conditions are met.  Specifically, the special rule for online software in Reg. § 1.199-3(i)(6)(iii) is satisfied, *inter alia*, if the taxpayer can show, as per the Congressional Letter, that there is competitive "substantially identical" software that is downloaded by a customer or provided via a disc or other tangible medium.[6]  Conversant presented to both Exam and the IRS Independent Office of Appeals ("**Appeals**") the dJAX Enterprise Ad Server ("**dJAX**") software platform which is just such a competitive "substantially identical" software product that is downloaded by a dJAX customer or provided to such customer via a disc or other tangible medium.

27.    DPGR, for purposes of this case, is limited to gross receipts derived from the sale, lease, license or other disposition of QPP (Treas. Reg. § 1.199-3(i)(6)(i)) or to gross receipts deemed to be derived from the sale, lease, license or other disposition of QPP (Treas. Reg. § 1.199-3(i)(6)(iii)).  By contrast, gross receipts derived from the performance of services generally do not

---

[5] *See* highlighted portion of the July 21, 2005 Letter attached as **Exhibit 5**.
[6] *See* generally Treas. Reg. § 1.199-3(i)(6)(iv) for the definition of "substantially identical" software. That provision in the regulations requires that the competitive software "(1) from the customer's perspective, has the same functional result as the taxpayer's online software; and (2) has a significant overlap of features or purpose with the taxpayer's online software."

constitute DPGR.  Treas. Reg. § 1.199-3(i)(4)(i).  Where a taxpayer sells, leases, licenses, or otherwise disposes of QPP (or is so treated), and also performs services that are not separately charged, the gross receipts attributable to the performance of the embedded services (with certain exceptions) do not constitute DPGR.  *See id.*  Where a taxpayer receives a single bundled payment from customers in exchange for both QPP and services, an allocation of the single item of gross receipts is required to be made to reflect the portion of the overall bundled price that is attributable to the embedded services and the portion attributable to the disposition of QPP.  *See* Treas. Reg. § 1.199-1(d)(1)(ii) (the so-called "shrink-back" rule).

## **FACTUAL BACKGROUND**

### I.    **MP and CJ Ad Server Platforms**

28.    Conversant provides its advertising customers (*i.e.,* the advertising departments of major brands and independent advertising agencies) with electronic access to a computer program, applications, and corresponding data that "helps marketers gain complete control over digital advertising across multiple sites, placements and creative types."[7]

29.    Conversant provides its advertising customers (*i.e.,* the advertising departments of major brands and independent advertising agencies) "proprietary technology platforms [*i.e.,* software] for online advertising inventory aggregation; campaign targeting and optimization, delivery, measurement, and reporting; and, payment settlement and delivery services."[8]

30.    The CJ and MP ad servers provide the advertisers with an integrated platform that enables the advertiser to configure, run, target and manage digital advertising without any human involvement from CJ or MP unless the software platform crashes, is updated, routine maintenance is

---

[7] *Conversant Ad Server: User Guide* (2015) p. 4.  (Page 4 is attached hereto as **Exhibit 6**.)
[8] ValueClick 2010 Form 10-K filing, p. 1.  (Page 1 is attached hereto as **Exhibit 7**.)

performed, or the advertiser needs separately charged support.

31.    The CJ and MP user interfaces ("UI") allow the customer to specifically configure each specific ad campaign, to decide which functions and features in the CJ and MP software platform the customer will use to run and manage its specific ad campaign.  The customers of CJ and MP (*i.e.,* the advertisers and national brands) and not CJ and MP (*i.e.,* the software platform providers) have the sole choice of what features and functions within the CJ and MP software platforms they want to employ in any given ad campaign.  The customers of CJ and MP (*i.e.,* the advertisers and national brands) and not CJ and MP (*i.e.,* the software platform providers) provide the advertisements that are placed on Publisher websites.  The advertisers and national brands generally deliver their advertising images to a Content Delivery Network (*e.g.,* Akamai) which caches web content and delivers it to targeted websites within milliseconds.  CJ and MP do not create nor store customer advertisements.

## II.    Customer Use of the CJ Ad Server Platform

32.    By logging into and using the UI, customers of CJ directly use the software in the CJ ad server platform to perform the following specific advertising tasks:

a.    Become a new client to the software platform (a new advertiser, customer, or business unit).

b.    Add a client contact and provide specified information or not provide information to that contact.

c.    Choose the class of Publisher sites for the advertiser's ad campaign, *i.e.,* where the ads will be shown, and work out the details on commission rates, search and other marketing policies, as well as any performance incentives the advertiser might offer.

d.    Add and configure a new ad campaign to run on the CJ software platform.

e.   Determine where, on a Publisher's web page, advertisements are to be placed.

f.   Specify the type of ad, the size, the frequency and the time period to show individual ads on the Publisher site, including the rotation of a set of ads. Essentially, these specifications control which ads in the inventory are to be placed and the audience to which such ads are delivered.

g.   Upload creatives (*i.e.*, ads), including flash creatives, to the platform to be shown when a web surfer clicks on the client site and/or web page specified by the advertiser in the configuration; also, to preview these creatives.

h.   Assign specific creative content to specific placements on a Publisher web page.

i.   Edit in real time the placements of ads, the creatives assigned to a placement, and the location of an ad on a Publisher's web site.

j.   Provide Publishers with instructions for ad placement (*e.g.,* ad to be placed, frequency, size, etc.), which advertisements the Publisher will receive on the serving of an ad tag when a web page user opens a specific web page on which an ad from the advertiser's campaign is to be placed.

k.   Use detailed analytical tools to gather information on particular aspects of a campaign. These tools allow the advertiser to select the specific reporting parameters and to create customized reports as needed. Reports are available, at the advertiser's choice, by geography, by individual ad and creative performance, by return of investment ("***ROI***"), by clicks, by conversions, by cost, etc.

l.   Use data management tools.

m.   Use ad tag management tools for submitting ads to publisher websites after Publishers place ad tags on a particular web page calling for an ad from the specific advertiser.

> n. Run attribution analysis and analytical reports.
>
> o. Track campaign metrics.
>
> p. Manage creative inventory.

33. By logging into and using the UI, customers of MP directly use the software in the MP ad server platform to perform the following specific advertising tasks:

> a. Become a new client to the software platform (a new advertiser, customer, or business unit).
>
> b. Add a client contact and provide specified information or not provide information to that contact.
>
> c. Add targeted Publisher sites, based on the advertiser's separate negotiation with these sites, to the advertiser's ad campaign, *i.e.,* where the ads will be shown and details on commission rates, search and other marketing policies, as well as any performance incentives the advertiser might offer.
>
> d. Add contacts at the Publisher site to receive reports for activity on their site.
>
> e. Add and configure a new ad campaign to run on the MP software platform.
>
> f. Determine where, on a Publisher's web page, advertisements are to be placed.
>
> g. Specify the type of ad, the size, the frequency and the time period to show individual ads on the Publisher site, including the rotation of a set of ads. Essentially, these specifications control which ads in the inventory are to be placed and the audience to which such ads are delivered by factors such as which Publisher calls on the ad to be placed, and the geography, time, income, age, sex, etc. of the web page user.
>
> h. Upload creatives (*i.e.*, ads), including flash creatives, to the platform to be shown

when a web surfer clicks on the client site and/or web page specified by the advertiser in the configuration; also preview these creatives.

i.  Assign specific creative content to specific placements on a Publisher web page.

j.  Edit in real time the placements of ads, the creatives assigned to a placement, and the location of an ad on a Publisher's web site.

k.  Configure orders to the Publishers with instructions for ad placement with ad tags that are used to call the MP software to deliver an ad when a web surfer opens a specific web page on which an ad from the campaign is to be placed.

l.  Use detailed analytical tools to gather information on particular aspects of a campaign. These tools allow the advertiser to select the specific reporting parameters and to create customized reports as needed. Reports are available, at the advertiser's choice, by geography, by individual ad and creative performance, by ROI, by clicks, by conversions, by cost, etc.

m.  Use data management tools.

n.  Use ad tag management tools.

o.  Run attribution analysis and analytical reports.

p.  Track campaign metrics.

q.  Manage creative inventory.

34.  Once the CJ and MP software is configured and the features and functions are entered by the customers through the UI into the CJ and MP ad server platforms, the software runs autonomously. The employees of CJ and MP do not place ads on publisher websites and do not track consumer clicks on advertisements. These activities are performed by the software platform

without the intervention of CJ or MP employees.  In fact, the only individuals who interact with the specific software that is associated with the CJ and MP software platforms (unless it breaks and needs repair or separate support services are requested, *e.g.,* managed campaign assistance) are the employees or agents of the CJ and MP customers (who access the CJ and MP servers through the respective UIs) who configure each advertising campaign as described above and who use the analytical software tools to increase the effectiveness of their ad campaigns by calling up real-time metrics through the software so that they can change the type, timing, size and targeting of the advertising that is the subject of their ad campaign.

### III.    The Treas. Reg. § 1.199-3(i)(6)(iii) Substantially Identical Software

35.    The dJAX Enterprise Ad Server platform was, in 2013, offered to customers by disc or download and offered customers functions and features that were substantially identical to those that were available in the CJ and MP ad server platform products.

36.    dJAX enabled a customer to:

    a.  Purchase the software and become a new client to the software platform (a new advertiser,  customer, or business unit).

    b.  Add an independent ad network of targeted Publisher sites for use in the advertiser's  ad campaign, *i.e.,* where the ads will be shown.

    c.  Add contacts at the Publisher site to receive reports for activity on their site.

    d.  Add and configure a new ad campaign to run on the dJAX software platform.

    e.  Determine where, on a Publisher's web page, advertisements are to be placed.

    f.  Specify the type of ad, the size, the frequency and the time period to show individual ads on the Publisher site, including the rotation of a set of ads.  Essentially, these specifications control which ads in the customer's inventory are to be placed and the

audience to which such ads are delivered by factors such as which Publisher calls on the ad to be placed, and the geography, time, income, age, sex, etc. of the web page user.

g.  Upload creatives (*i.e.*, ads), including flash creatives, to the platform to be shown when a web surfer clicks on the client site and/or web page specified by the advertiser in the configuration; also to preview these creatives.

h.  Assign specific creative content to specific placements on a Publisher web page.

i.  Edit in real time the placements of ads, the creatives assigned to a placement, and the location of an ad on a Publisher's web site.

j.  Configure orders to the Publishers with instructions for ad placement with ad tags that are used to call the dJAX software to deliver an ad when a web surfer opens a specific web page on which an ad from the campaign is to be placed.

k.  Use detailed analytical tools to gather information on particular aspects of a campaign. These tools allow the advertiser to select the specific reporting parameters and to create customized reports as needed.  Reports are available, at the advertiser's choice, by geography, by individual ad and creative performance, by ROI, by clicks, by conversions, by cost, etc.

l.  Use data management tools; use ad tag management tools.

m.  Run attribution analysis and analytical reports.

n.  Track campaign metrics.

o.  Manage creative inventory.

37.  The table below summarizes the functionality/features provided by the CJ ad server platform software that advertisers directly used. The chart below also indicates that substantially

identical features/functionality were available via the dJAX comparable software:

**Table 1 – CJ Ad Server Platform Compared to dJAX Features/Functionality**

| Features/Functionality (Commission Junction Platform) | Third Party Comparable Software: dJAX Enterprise Ad Server |
|---|---|
| Create and Manage campaign | ✓ |
| Inventory and Upload Creatives | ✓ |
| Input and targeting requirements | ✓ |
| Rules based ad placing | ✓ |
| Ad tag generation | ✓ |
| Provide ad serving | ✓ |
| Matching Advertisers with Affiliates | |
| Reporting and analytics | ✓ |

38.    The table below summarizes the functionality/features provided by the MP ad server platform software that advertisers directly used. The chart below also indicates that substantially identical features/functionality were available via the dJAX comparable software:

**Table 3 – MP Ad Server Platform Compared to dJAX Features/Functionality**

| Features/Functionality (MediaPlex Platform) | Third Party Comparable Software: dJAX Enterprise Ad Server |
|---|---|
| Create and Manage campaign | ✓ |
| Inventory and Upload Creatives | ✓ |
| Input ad targeting requirements | ✓ |
| Rules based ad placing | ✓ |
| Ad tag generation | ✓ |
| Provide ad serving | ✓ |
| Reporting and analytics | ✓ |

## IV.    Bloomberg v. Commissioner, T.C. Memo. 2024-108 ("*Bloomberg*")

39.    The *Bloomberg* case had not been decided during Exam's analysis of Conversant's claim, nor was the *Bloomberg* case decided when the Conversant claim was presented to Appeals. The *Bloomberg* case, however, focuses directly on several of the issues in this case, and addresses directly certain of the arguments found in the Examination Report.

40.    The *Bloomberg* case focused only on the qualification provisions contained in Treas. Reg. § 1.199-3(i)(6)(iii) (*i.e.,* qualification based on substantially identical software).  Importantly, the following points that were articulated by Judge Goeke in his opinion should control the similar issues in this case:

    a.    The first element of the IRS position in this case that is answered by *Bloomberg* is that merely referring generically to the software at issue as part of a "service" is not dispositive.  Bloomberg labeled its agreements with customers as an agreement to obtain the Bloomberg Professional Service ("***BPS***").  The *Bloomberg* decision notes that the BPS Subscription Agreements entered into in the years at issue identified Bloomberg as a "service provider" and the customer as a "service recipient."  On its federal income tax returns for the years at issue in the case, Bloomberg reported its principal business activity as "business services" and its principal product or services as "information services."  On Bloomberg's consolidated financial statements for the years at issue, it identified BPS revenue as being from "[f]inancial information services."  Yet despite these specific statements as to providing a service, Bloomberg claimed section 199 deductions on its tax returns based on gross receipts that it determined were derived from providing software to BPS users under the specific provisions of Treas. Reg. § 1.199-3(i)(6)(iii).  The Tax Court agreed that a portion of the BPS revenue qualified as DPGR, stating that "[t]here is nothing inconsistent with Bloomberg's identification of its business and principal product as a service and its claimed section 199 deductions."

    b.    Second, *Bloomberg* involved a server-client architecture structure whereby the customer of Bloomberg gained access to the full range of software found in the Bloomberg servers by entering a digital key on the customer's computer, mobile

device, etc. to connect to the Bloomberg servers which housed the BPS software. The Tax Court's conclusion that the client server architecture, similar to that at issue in this case (involving the same key structure through a UI) is not a limitation on the qualification of the software.

c.   On the question of "direct use" and the IRS position on the "threshold" requirement of Treas. Reg. § 1.199-3(i)(6)(iii), the Bloomberg decision holds that the threshold requirement can be broken up into four elements: (1) the taxpayer must derive gross receipts from providing customers access to computer software, (2) the software must be MPGE in whole or in significant part by the taxpayer within the United States (this factor is not at issue in this case), (3) customers must directly use the software, and (4) customers must use the software while connected to the internet or any other public or private communications network (this factor is not at issue in this case).  While the Bloomberg court addressed several elements of the software that was contained in the BPS, the most relevant Bloomberg software addressed by the Tax Court, and the software that is most closely related to the facts of this case, is Bloomberg's "analytical and graphing software."  The Tax Court made the following statement with respect to the analytical and graphing software that mirrors the facts that exist for the CJ and MP ad server software:

> A portion of BPS software [i.e., the analytical and graphing software] enabled BPS users to analyze, manipulate, and model the financial information that was available through BPS. This portion of software included tools for graphing, calculating, managing portfolio risk, etc. Unlike other BPS software discussed in this OPINION Part VII.B.1, the analytical and graphing software did not merely enable or facilitate the provision of Bloomberg's financial information or any other service. Considering the facts and law, we rule that Bloomberg derived a portion of the BPS subscription fees for providing customers with access to the analytical and graphing software.

> While other BPS software enabled or facilitated Bloomberg's financial
> information or communication services, BPS analytical and graphing software
> did not. Instead, it helped users to draw their own insights from financial
> information. Whereas users had no control over the underlying financial
> information that they could access through BPS, users had a high amount of
> control over how they could analyze and/or visualize that information. Indeed,
> users could use analytical and graphing software to overwrite BPS-supplied data
> with other values to test assumptions or hypotheses. Users could also create
> bespoke visual representations using the extensive number of graphing functions
> and tools that BPS provided. *Bloomberg*, T.C. Memo. 2024-108 at 53.

In the same manner that the BPS user can use the BPS software to analyze,
manipulate, and model financial information to help users find "signals in the noise,"
the CJ and MP users analyze, manipulate, and model advertising campaigns by
exercising a high degree of control as to how they choose which of the functions
available in the CJ and MP platforms will be used in any campaign and which
functions can be overwritten or supplemented (*e.g.,* by adding the creative
advertisements; by entering into the platform which websites to use; by setting up the
parameters of ad size, ad location on the website, ad frequency, and ad start and end
date). Users of the CJ and MP software also used the software to analyze the results
obtained in any in-process or completed ad campaign to improve performance, and
this software functionality allowed a user, like the BPS user, to find "signals in the
noise" to improve the CJ and MP customer's ad campaign performance and ROI of
such customer's ad budget spend.

d.  On the specific question of direct use, the *Bloomberg* Court noted that direct use is
not defined in the regulations, but the Tax Court noted that the key to direct use was
that the software "produced results in response to customer prompts." Like the user
of the BPS, the user of the CJ and MP ad server software causes the ad server
software "to perform desired functions" that are specific to the customer's prompts.

The customer, and not CJ or MP, configures the elements of the software's functionality to achieve a unique to the customer ad campaign that the customer believes will yield the best and most efficient results.

e. Finally, the *Bloomberg* Court addresses another of the Examination Report's positions as to whether Conversant must directly charge for software. The Tax Court held that, to satisfy section 199, Bloomberg must "derive" gross receipts from the provision of access to software, and that it need not "directly derive" gross receipts from the software. The Court agreed that a portion of the BPS Subscription Fee was attributable to the customer's use of the analytical and graphing software, and, therefore, that Bloomberg should determine a reasonable portion of the bundled Subscription Fee to be allocated to the portion of the BPS software that met the section 199 qualification rules. Likewise, in this case, CJ and MP **derive** revenue from providing its customers with access to the CJ and MP software. Conversant has reasonably allocated the portion of its gross receipts derived from customers to the value of the software to which these customers are given access.

## V.     Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (U.S. June 28, 2024) ("*Loper*")

41.     The Supreme Court, again after both Exam and Appeals had considered Conversant's claim, reached a decision in the *Loper* case that has application to this case. As Judge Goeke stated in *Bloomberg* (footnote 38) citing *Loper*, "if a government agency's interpretation of a statute 'is not the best, it is not permissible.'" Here we have a taxpayer, Conversant, falling squarely in the cross-hairs of Congressional intent. Conversant developed QPP (*i.e.,* software) in whole, or in significant part, in the United States. It marketed an ad server software platform that enabled advertising agencies and national brands to use the software to better market their products.

Conversant did not perform an advertising service for these customers; rather, Conversant gave these customers the right to directly use the QPP software (as noted previously, to use the CJ and MP software to manipulate, formulate, control, analyze, and model an advertising campaign unique to the CJ or MP customer) to provide for themselves a better, more efficient, advertising service.  If there were no ad server platform and no internet in 2013, the advertising agencies and national brands would still be advertising, but would have to undertake their advertising "by hand."  With the advent of computers and the software applications loaded into these computers, CJ and MP enabled these customers a more efficient alternative, but the advertising is still done by the advertising agencies and national brands.  It is not done by Conversant.  Conversant could have supplied its software to customers by disc or download as was the case with dJAX.  But it chose to use a more efficient client-server configuration.  Providing the software on a hosted basis (SAAS) does not transform the provider of the software into a service provider.  *Bloomberg* makes this clear, the Congressional Letter makes this clear, and *Loper* mandates that the regulations need to be  interpreted in a manner consistent with the intent of the underlying statute.

## VI.    DPGR/non-DPGR Allocation

42.    Conversant allocated CJ and MP receipts between DPGR and non-DPGR categories by excluding separately billed services that might be requested by customers and by also excluding a portion of the receipts from advertisers that may not have been separately invoiced, but were nevertheless attributable to services performed by CJ and MP and not attributable to the CJ and MP software.  (*See* Treas. Reg. § 1.199-3(i)(4)(i) which requires a taxpayer to allocate bundled receipts between DPGR and non-DPGR.)  Conversant then included in DPGR all of the receipts from advertisers that arose out of the ad server platform which resulted from the advertising customers using the CJ and MP ad server software to place advertisements on web sites.

43.     Treas. Reg. §1.199-3(d)(1) provides that a taxpayer may use "any reasonable method that is satisfactory to the Secretary based on all of the facts and circumstances." Based on the legislative history and the purpose of section 199, the allocation method used by Conversant to allocate the receipts derived by CJ and MP for their ad server platforms and related services between DPGR and non-DPGR is reasonable because it relied on the principles of section 482.

44.     Conversant made no distinction as to the allocation of revenue between DPGR and non-DPGR under the qualification rules of Treas. Reg. § 1.199-3(i)(6)(i) and Treas. Reg. § 1.199-3(i)(6)(iii).

**VII.    50% W-2 Wage Limitation**

45.     The IRS maintains that the W-2 wages that properly serve as the limitation under section 199(b)(1) are only those wages that are dedicated to software development activities. Conversant, however, believes that the legal rule is clear in that all wage expenses that are deducted from DPGR in order to arrive at QPAI are counted in the W-2 wage limitation.

46.     Section 199(c)(1)(B) clearly provides that the deductions taken into account for determining QPAI and DPAD are all expenses and deductions that are properly allocable to DPGR. There is no indication in the statute or the regulations that the W-2 wage limitation is to be based on only software development wages.

**VIII.  Refund Claim**

47.     On Conversant's original 2013 consolidated federal income tax return, filed electronically on September 13 , 2014, Conversant failed to claim the domestic production activities deduction allowed by section 199.  On September 8, 2017, within the statute of limitations set out in section 6511, Conversant filed a Form 1120X (**Exhibit 4**) claiming an entitlement to a section 199 DPAD of $7,971,939, resulting in a claimed tax refund of $2,790,178.

## IX.    Tax Filing, Examination, and Appeals Processes

48.    Exam examined the Form 1120X which was filed by Conversant, and it provided Conversant a notice of disallowance of the claim (Letter 569) on March 22, 2021.

49.    Conversant filed a Protest with Appeals on April 30, 2021; it filed a Supplemental Protest on February 25, 2022; and, on May 10, 2023, Appeals issued by certified mail a formal notice of disallowance of the claim.

50.    This suit for refund is commenced within the period of limitation specified in section 6532(a)(1).

## X.    The IRS's Allegations and Adjustments Are Erroneous

51.    The IRS's allegations and adjustments contained in the Examination Report (and as accepted by Appeals) are wrong for several reasons, including those described in paragraphs 52 to 55 below and in paragraphs 1 – 46 above.

52.    Conversant enters into transactions with its customers (*i.e.,* advertising agencies and consumer brands) that constitute, in whole or in part, a lease or other disposition of software to its customers under Treas. Reg. § 1.199- 3(i)(6)(i).  *See* paragraphs 18 – 34 above.  Thus, the IRS allegations that Conversant does not satisfy the requirements of Treas. Reg. § 1.199-3(i)(6)(i) are erroneous.

53.    The transactions that Conversant enters into with its customers, if such transactions do not qualify as a lease or other disposition of software to its customers under Treas. Reg. § 1.199- 3(i)(6)(i), nevertheless qualify under the third-party comparable exception of Treas. Reg. § 1.199- 3(i)(6)(iii).  *See* paragraphs 28 – 38 above.  The IRS allegations to the contrary are erroneous for the following reasons:

a.  In 2013, Conversant derived gross receipts from providing customers access to computer software MPGE in whole or in significant part by the taxpayer within the United States for the customers' direct use while connected to the Internet or any other public or private communications network (online software). The access to the Conversant software was provided to the customer through the access key known as the UI.

b.  In 2013, dJAX derived, on a regular and ongoing basis in its business, gross receipts from the lease, rental, license, sale, exchange, or other disposition of computer software that: (1) from a customer's perspective, had the same functional result as the CJ and MP ad server online software (*see* paragraphs 28-38); and (2) had a significant overlap of features or purpose with the CJ and MP ad server online software (*see* particularly  paragraphs 35 – 38).

c.  In 2013, dJAX provided its software to customers either affixed to a tangible medium (for example, a disk or DVD) or by allowing them to download the computer software from the Internet (*see* paragraph 35).

54.    Conversant allocated on a reasonable basis a portion of the revenue derived by CJ and MP between DPGR and non-DPGR.  This allocation was based on treating as DPGR all of the fees received by CJ and MP from its customers other than: (i) separately invoiced fees for services, and (ii) the portion of bundled fees received by CJ and MP from its customers for services embedded with the customer's access to software.  The IRS allegations, that the allocation and apportionment by Conversant between DPGR and non-DPGR were unreasonable, are erroneous.

55.    Conversant agrees that the W-2 50% wage limitation set forth in section 199(b)(1)

sets an upper limit on Conversant's QPAI.  However, the W-2 wages that are to be used as the reference wages are all W-2 wages that are properly allocated to DPGR in calculating QPAI. The IRS proposed limitation to only W-2 wages for software development is erroneous.

## COUNT ONE: CONVERSANT IS ENTITLED TO A REFUND OF TAX PAID FOR 2013

56.    Plaintiff incorporates by reference and realleges the facts, the law, and the conclusions derived therefrom as set forth in paragraphs 1 through 55.

57.    Plaintiff is entitled to a section 199 DPAD of $7,971,939 in its 2013 taxable year, resulting in a tax refund of $2,790,178 for its 2013 taxable year as set forth in its Form 1120X filed on September 8, 2013 (**Exhibit 4**).

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor in the amount of $2,790,178, or such greater amount as may be allowed by law, plus any other amount, including interest and costs, allowed by law, and such other relief as the Court may deem just.

Respectfully submitted,

**/s/** Michael F. Solomon

Michael F. Solomon                                    DATED: May 8, 2025
DC Bar No. 942581
WA Bar No. 45912
Attorney for Plaintiff

MFSolomon Tax Consulting LLC
P.O. Box 8673 (Mailing Address)
6279 Via Campo Verde (Office Address)
Rancho Santa Fe, CA 92067
Telephone: (202) 744-8883
Email: mfs@mfstax1.com

EXHIBIT 1

**<u>REDACTED IN FULL</u>**

EXHIBIT 2

**<u>REDACTED IN FULL</u>**

EXHIBIT 3

**<u>REDACTED IN FULL</u>**

EXHIBIT 4

**<u>REDACTED IN FULL</u>**

EXHIBIT 5

# Congress of the United States

## Washington, DC 20515

July 21, 2005

The Honorable John W. Snow
Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

Dear Secretary Snow:

Today, we introduced H.R. 3376 and S. 1447, the Tax Technical Corrections Act of
2005. We are aware that a number of technical corrections contained in the bill are
necessary to carry out the intent of section 199 of the Internal Revenue Code, which
provides a deduction relating to income attributable to certain domestic manufacturing
activities. These technical corrections would, among other things, clarify that:

1.      Gross receipts derived from certain contracts to manufacture or produce property
for the Federal government are derived from the sale of such property and, therefore, are
domestic production gross receipts,

2.      For purposes of determining the domestic production gross receipts of a
partnership and its partners, provided all of the interests in the capital and profits of the
partnership are owned by members of a single expanded affiliated group at all times
during the taxable year of the partnership, then the partnership and all members of that
expanded affiliated group are treated as a single taxpayer during such period,

3.      With respect to the domestic production activities of a trust or estate, the items to
be taken into account in computing the domestic manufacturing deduction shall be
apportioned between the beneficiaries and the fiduciary (and among the beneficiaries)
under regulations prescribed by the Secretary of the Treasury,

4.      A corporation eligible for the domestic manufacturing deduction with respect to
income of a subsidiary must own more than 50 percent, rather than 50 percent or more, of
the subsidiary's stock by vote and value,

5.      The domestic manufacturing deduction for purposes of computing alternative
minimum taxable income ("AMTI")  is the same for purposes of computing the regular
tax except that, in the case of a corporation, the taxable income limitation is the
corporation's AMTI,

6.      Unrelated business taxable income, rather than taxable income, applies for
purposes of Code section 199(a)(1) in computing the unrelated business income tax,

The Honorable John W. Snow
July 21, 2005
Page 2 of 2

7.      The domestic manufacturing deduction is not taken into account for purposes of computing taxable income under the rules relating to the carryover of net operating losses,

8.      The Secretary of the Treasury has the authority to prescribe rules to prevent the domestic manufacturing deduction from being claimed by more than one taxpayer with respect to the same economic activity described in Code section 199(c)(4)(A)(i),

9.      The coordination of the computation of (i) adjusted taxable income of a corporation for purposes of computing a corporation's limitation on the deduction for interest on certain indebtedness, and (ii) taxable income for purposes of computing a corporation's charitable contribution deduction and a taxpayer's deduction for percentage depletion with respect to oil and gas wells, with the domestic manufacturing deduction, and

10.     In applying the effective date of the domestic manufacturing deduction, items arising from a taxable year of a partnership, S corporation, estate, or trust beginning before 2005 are not taken into account for purposes of the rules providing that the deduction is determined at the partner, shareholder or similar level and the application of the wage limitation with respect to such entities.

We trust that this letter provides sufficient clarification so that appropriate regulatory guidance may be issued reflecting our intention.

In addition, we would ask you to consider further the treatment of online access to computer software and, in particular, whether such treatment should be similar to the treatment of computer software distributed by other means, such as by physical delivery or delivery via internet download.  Please include the results of your consideration of this issue in future published guidance.  In considering this issue, please note that gross receipts from the provision of services are not treated as domestic production gross receipts, regardless of the fact that computer software may be used to facilitate such service transactions.

                                            Sincerely,

William M. Thomas, Chairman                 Charles E. Grassley, Jr., Chairman
Committee on Ways & Means                    Committee on Finance

                                            Max Baucus, Ranking Member
                                            Committee on Finance

cc:     Mr. Eric Solomon, Acting Deputy Assistant Secretary (Tax Policy)

EXHIBIT 6



## ►1.2 Conversant Ad Server Overview

Conversant Ad Server is the most advanced technology available for managing online advertising and maximizing return on investment (ROI). Conversant Ad Server offers a user-friendly web-based interface, manages campaigns across multiple sites, serves advertising, and tracks campaign performance. Conversant Ad Server also offers a full set of advanced tools for analytics, optimization, targeting, conversion tracking, rich media and dynamic messaging.

**Conversant Ad Server's** intelligent delivery engine offers many creative messaging tools:

- Rich Media Interaction Tracking - measure behavior of users based on interactions with the creative unit
- Targeting - send relevant messages based on behavior
- Dynamic Messages - update creative in real-time based on business strategies (product merchandising, promotional offers, etc)
- Automatic Optimization - showcase the best performing messages to lower cost per acquisition

**Conversant Ad Server** also offers a competitive advantage to you and your clients by offering:

- Workflow efficiencies such as workbook configuration and Media Director
- Natural Search
- Near real-time reporting (including conversions)

Conversant Ad Server helps marketers gain complete control over digital advertising across multiple sites, placements and creative types. Conversant Ad Server handles the entire campaign process including planning, trafficking, and data analysis.



*Advertising Campaign Lifecycle Fig 1.3*

This diagram illustrates the benefits of Conversant Ad Server over the life cycle of an advertising campaign.

EXHIBIT 7

10-K 1 a2202135z10-k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Year Ended December 31, 2010**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

**Commission file number 000-30135**

---

# VALUECLICK, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0495335** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**30699 RUSSELL RANCH ROAD, SUITE 250**
**WESTLAKE VILLAGE, CALIFORNIA 91362**
(Address of principal executive offices, including zip code)

**Registrant's Telephone Number, Including Area Code: (818) 575-4500**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.001 par value | NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**Series A Junior Participating Preferred Stock Purchase Rights**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files): Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☒

Table of Contents

**PART I.**

**ITEM 1.   BUSINESS**

**OVERVIEW**

ValueClick is one of the world's largest and most comprehensive online marketing services companies. We sell targeted and measurable online advertising campaigns and programs for advertisers and advertising agency customers, generating qualified customer leads, online sales and increased brand recognition on their behalf with large numbers of online consumers.

Our customers are primarily direct marketers, brand advertisers and the advertising agencies that service these groups. The proposition we offer our customers includes: one of the industry's broadest online marketing services portfolios—including performance-based campaigns and programs where marketers only pay for advertising when it generates a customer lead or product sale; our ability to target campaigns to reach the online consumers our customers are most interested in; and the scale at which we can deliver results for online advertising campaigns. Additionally, our networks of online publishers provide advertisers with a cost-effective and complementary source of online consumers relative to online portals and other large website publishers. Through this approach we have become an industry leader in generating qualified customer leads and online sales for advertisers.

We generate the audiences for our advertisers' campaigns primarily through networks of third-party websites, other online publisher partners and search engines. We aggregate our publisher partners' online advertising inventory into networks, optimize these networks for specific marketing goals, and deliver the campaigns across the appropriate networks' advertising inventory. We are one of the industry's largest online network providers, with: industry expertise and proprietary technology platforms for online advertising inventory aggregation; campaign targeting and optimization, delivery, measurement, and reporting; and, payment settlement and delivery services. We also own and operate a number of websites in the areas of comparison shopping, coupons and deals, financial services, and other verticals.

Our publisher partners enjoy efficient and effective monetization of their online advertising inventory through representation by our direct sales teams in major U.S. and European media markets, participation in large-scale advertiser and advertising agency campaigns they may not have access to on their own, enhanced monetization through our proprietary campaign optimization and targeting technology, and settlement services to facilitate payments to publishers for the online inventory utilized by the advertisers. As we do not primarily compete directly with our publisher partners for online consumers, we act as a trusted partner in helping online publishers monetize their online audience and advertising inventory.

We believe that the effectiveness of our online marketing services is dependent on the quality of our networks and our publisher partner relationships. As such, we have established stringent quality standards that include publisher rejection from our networks due to inappropriate content, illegal activity and fraudulent clicking activity, among other criteria. We enforce these quality standards using a combination of manual and automated auditing processes that continually monitor and review both website content and adherence to advertiser campaign specifications.

We derive our revenue from four business segments. These business segments are presented on a worldwide basis and include Affiliate Marketing, Media, Owned & Operated Websites, and Technology, which are described in more detail below. For information regarding the operating performance and total assets of these segments, see Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Note 18 to the December 31, 2010 consolidated financial statements included herein.